OPINION OF THE COURT
Minna R. Buck, J.
By decision dated October 17, 1983, the court found the three children named in the above-recited neglect dockets to be neglected children, and directed petitioner to present its proposed plan for disposition to the court on or before October 31, 1983. At the time of making the decision, the court was aware that respondent mother had been convicted of a parole violation and had been committed to Bedford Hills Correctional Facility for at least two years. Since the whereabouts of the children’s father was unknown, it was evident continued placement of the children, who were already in the custody of the Department of Social Services (hereinafter DSS), would be necessary; the primary issue relating to disposition concerned plans for respondent’s visitation, if any, with the children.
A fact-finding order was signed on December 16, 1983, and entered on January 31,1984. However, no service plan *1025 or proposed dispositional order was presented by DSS, nor was any visitation arranged between respondent and her children, despite continued requests for visitation from respondent and her attorney. On the court’s own motion, the matter was restored to the calendar on March 21,1984, and DSS again directed to present a proposed service plan at that time. No such plan was submitted on the return date, and a dispositional hearing was scheduled for May 7, 1984.
Respondent and her attorney were present, and the Law Guardian for the child was present at the dispositional hearing. DSS presented as its only witness a supervisor employed by its Children’s Protective Services to whom each of the above cases had been assigned, starting in February, 1983. She testified that the service plan prepared pursuant to 18 NYCRR 428.3 called for reunification of the children with their mother. She described in detail the usual arrangements for transportation of children to Bedford Hills for visitation. The trip takes five hours each way by bus; the practice followed in the past has been for a DSS worker to accompany a child on a bus chartered by Catholic Charities which makes the round trip once each month between Syracuse and Bedford Hills. The bus leaves Syracuse at 4:00 a.m. and returns from Bedford Hills at 9:00 p.m. that same day. Since places on the bus are limited, the rule (apparently of Catholic Charities) has been that only one child in each family could visit at a time, which would limit visitation in this case to no more than once every four months for each child.[2] Although the witness conceded that alternate means of transportation might be found, her recommendation was that it would be preferable to arrange for visitation in Syracuse to eliminate the burden of the long trip, particularly for the infant, as well as to minimize the burden to the DSS staff.
The witness acknowledged that DSS had not taken any steps to arrange for visitation under any circumstances, and that she was unfamiliar with the physical facilities which might be available for visitation by respondent with the children in this county (those facilities being the Public Safety Building or the Onondaga County Correctional *1026 Facility). She also testified that, in her opinion, lack of visitation for the duration of the proposed 18-month placement would not make it more difficult to achieve the stated goal of reunification.
At the conclusion of the hearing, and after hearing the recommendation of the Law Guardian, the court rendered its decision from the Bench, that visitation with the mother during the period of placement was in the best interests of the children and was required by the law (see Social Services Law, § 384-b, subd 7) and directed that respondent be granted visitation with the children before her return to Bedford Hills. The court reserved decision on the location and frequency of future visitation.
The Law Guardian made inquiry into arrangements for visitation and recommended visitation take place in Syracuse twice each month; he strongly recommended against visitation at Bedford Hills because of the lengthy travel time. The court also made inquiry as to the physical arrangements at the two local facilities, and concluded that visitation should take place at Onondaga County Correctional Facility rather than the Public Safety Building because the setting at the former facility was more conducive to meaningful visitation, particularly in view of the number of children involved, and because of the respective capacities of the two facilities. The County Attorney has objected to entry of such an order on the grounds that the court lacks authority to require the county to accept custody (other than for the purposes recited in Correction Law, § 500-c) of an inmate already committed to a State Commissioner of Correction.
The court disagrees. Subdivision (c) of section 1055 and section 255 of the Family Court Act authorize the court to direct any State or county official to render assistance within his legal authority to further the purposes of the act.
Certainly, DSS cannot argue lack of jurisdiction in the court. As noted above, section 384-b (subd 7, par [a]) of the Social Services Law requires DSS to use diligent efforts to strengthen parental relationships unless it can be shown that such efforts would be detrimental to the interests of the child; and paragraph (f) of the same section defines *1027 diligent efforts as including “suitable arrangements” for visitation which, in the case of incarcerated parents, shall not require visitation outside the correctional facility “unless reasonably feasible and in the best interest of the child”. (Social Services Law, § 384-b, subd 7, par [f], cl [2].) In the circumstances before us, it is clear that visitation outside Bedford Hills is more likely to be in the best interests of the children, and no showing has been made that such visitation at Onondaga County Correctional Facility would not be reasonably feasible.
With respect to the State Commissioner of Correction, he is required pursuant to section 619 of the Correction Law to cooperate with DSS in making suitable arrangements for an inmate to visit with her child pursuant to the Social Services Law. The State Commissioner is also authorized, pursuant to subdivision 2 of section 72 of the Correction Law, to “permit an inmate to be taken, under guard, to any place or for any purpose authorized by law, and [he] must provide for delivery * * * where his presence is required pursuant to an order of a court that has authority to require his presence” (emphasis supplied).
While it is true that no corresponding amendment has been made to section 500-c of the Correction Law, expressly authorizing the county to receive such an inmate in its own facilities for the purpose of court-ordered visitation, it may be reasonably inferred from the language of the sections cited above, and from the clear intent of the Legislature as set forth in section 1 of chapter 911 of the Laws of 1983 (see notes to Social Services Law, § 384-b), that the county has such authority.
Although the county’s concern about the proposed visitation order has been expressed in terms of the court’s jurisdiction, it is probably fair to say that the real issue from the county’s point of view is the cost of such visitation. The court takes sympathetic note of the burden imposed upon county taxpayers by the present arbitrary limit on reimbursement to counties by New York State for the costs of housing State prisoners. The county may well argue that such limitation is not applicable to the costs which are incurred in carrying out this order of visitation, and may *1028 wish to pursue that argument in some other form. Nevertheless, the resolution of that issue cannot be allowed to delay any further the implementation of a plan of visitation found by this court to be reasonable and in the best interest of these children.

. The parties and the Law Guardian stipulated that any order concerning visitation could also include provisions for visitation with respondent’s oldest daughter C., who is in DSS custody pursuant to an earlier voluntary placement.